**In re Virgil J. HOOD, Debtor.**

**Virgil HOOD, Plaintiff,**

**v.**

**Edwin L. WILLIAMS, Defendant.**

**Bankruptcy No. 86–00300–A.**
**Adv. No. 87–0011–A.**

United States Bankruptcy Court,
E.D. Virginia.
Alexandria Division.

May 16, 1988.

Order affirmed, D.C., 92 B.R. 656.

H. Jason Gold, Gold & Stanley, P.C., Alexandria, Va., for plaintiff/debtor.

Alan Rosenblum, Rosenblum & Rosenblum, P.C., Alexandria, Va., for defendant/Successful Foreclosure Sale Bidders.

Douglas E. Bywater, Tate & Bywater, Ltd., Vienna, Va., for defendant/Second Deed of Trust Holder.

## MEMORANDUM OPINION

DOUGLAS O. TICE, Jr., Bankruptcy Judge.

The debtor-in-possession in this chapter 11 case seeks by motion to set aside a foreclosure sale of his residence located at 1816 Upshur Street, N.W., Washington, D.C. Since the debtor's motion requests the Court to invoke its equity powers pursuant to 11 U.S.C. § 105(a), an adversary proceeding is required by Bankruptcy Rule 7001. Therefore, this matter will be considered as a continuation of Adversary Proceeding No. 87–0011–A, from which Chief Judge Martin V.B. Bostetter entered an

order modifying the automatic stay on November 30, 1987.

The sale was held on January 26, 1988, under a second deed of trust against the property held by Edwin L. Williams. At the auction sale a high bid was accepted by the trustee under the deed of trust; however, due to the granting of a temporary restraining order and preliminary injunction by this Court, the sale remains incomplete, and title has not been conveyed to the high bidders.

Procedurally, the Court convened a preliminary hearing upon the debtor's motion on February 1, 1988, at the conclusion of which Judge Bostetter issued a temporary restraining order that enjoined the second deed of trust note holder or his representatives from completing the foreclosure sale. Judge Tice conducted a final hearing on the motion on February 18, 1988, at the conclusion of which the Court continued the temporary restraining order as a preliminary injunction pursuant to Fed.R.Civ.P. 65 as incorporated by Bankruptcy Rule 7065 pending a determination of the motion's merits.

Bonnie Goldstein and James Grady, the successful high bidders for the property at the foreclosure sale, were represented at the final hearing by counsel and opposed the debtor's motion. The noteholder was represented but took no strong position on the controversy other than urging full payment of the debt secured by the deed of trust, including all collection expenses pursuant to the note. At the final hearing, the Court received evidence in the form of testimony and exhibits and took the debtor's motion under advisement. The following memorandum opinion shall constitute findings of fact and conclusions of law as required by Bankruptcy Rule 7052.

### Findings of Fact

The facts as revealed by the evidence taken at the final hearing and from the Court's files in the case are as follows.

The debtor filed a voluntary chapter 11 petition on February 24, 1986, and since that time has remained in possession of the property of the estate, including his residence, located at 1816 Upshur Street, N.W., Washington, D.C. (the residence). The parties have stipulated that the debtor and his nondebtor spouse hold the residence as tenants by the entirety. Schedule A–2 of the petition reveals two deeds of trust on the residence, and the B–4 schedule reveals that the debtor has not exempted his interest in the residence from the estate.[1]

In addition to the instant chapter 11 case, there is also pending in this Court the related chapter 11 case of Moisture Protection Systems Analysts, Inc. (MPSA) (Case No. 86–00375–A), a corporation in which the debtor is an officer, director and sole shareholder. As will be noted in the discussion portion of this opinion, the debtor and MPSA have each filed an original and a first amended joint disclosure statement and a joint plan of reorganization.

On January 8, 1987, the debtor initiated this adversary proceeding by filing a complaint against Edwin L. Williams, holder of a note secured by a second deed of trust against the residence; the purpose of this adversary proceeding was to determine the validity of Williams' claim against the residence. The parties ultimately entered into a settlement of this dispute, which required the debtor to pay the note holder $373.75 per month, interest only, commencing May 15, 1987, with the principal balance of $34,-500.00 due in full on April 15, 1988. The settlement was incorporated in an order entered by Judge Bostetter on July 22, 1987, which additionally contained what is commonly referred to as a "drop dead" provision granting modification of the automatic stay upon default of payment:

> It is further ORDERED that in the event of default by debtor of the terms of this order the automatic stay provisions of 11 U.S.C. 362 are modified to allow this defendant to enforce the lien of the deed

---

1. The debtor's petition fails to disclose that the residence is held by the debtor and his nondebtor spouse as tenants by the entirety. The A–2 schedule also fails to reveal whether the deed of trust obligations on the residence are the debtor's sole obligation or joint obligations with his nondebtor spouse. However, the Court assumes that these are joint obligations.

of trust of May 20, 1982, against the real property of the debtor and to collect the sums due under the note of May 20, 1982.

The debtor failed to make any of the monthly payments required under his agreement with Williams. The debtor testified that he failed to make the payments due to a serious illness for which he was hospitalized in Jamaica and injuries he sustained in this country in an automobile accident following his release from the hospital. The debtor also testified that he was never told by his attorneys or others the amount of his required monthly payment under the settlement agreement.

On or about November 13, 1987, the second deed of trust holder, Williams, filed with the Court a motion for entry of an order granting relief from stay in accordance with the above quoted provisions of the parties' settlement order. The motion contained a certificate of service by mail to counsel for the debtor on the same date. At the hearing and in a Memorandum Of Points And Authorities filed with the Court, debtor's counsel states that he never received a copy of the noteholder's motion for relief from the stay.

The case file reveals that an order granting Williams' relief from the automatic stay was entered by Judge Bostetter on November 30, 1987, without a hearing. Debtor's counsel acknowledged that he duly received a copy of this order. However, the debtor testified that the first he knew of any new problem with the Williams' note was his receipt on December 26, 1987, of the notice of foreclosure sale from the trustee under the deed of trust. The notification received by debtor was for a foreclosure sale of the property scheduled for January 26, 1988, at 1:15 p.m.

The debtor's counsel raised no question with the Court concerning the manner in which Judge Bostetter's order of November 30 granting relief from the stay had been obtained by the noteholder's attorney. Instead, the debtor and his counsel determined to resolve the matter by debtor's refinancing the property and borrowing funds to pay off Williams' note prior to the foreclosure sale on January 26, 1988.

Much of the testimony offered by debtor concerned his efforts to borrow the approximately $58,000.00 necessary to pay the Williams' note. With the assistance of his neighbor, a real estate broker, the debtor on January 9, 1988, contacted a noninstitutional investor-lender who agreed to make the loan based upon payments of interest only at 24 percent per annum for a period of ten years. Debtor and his wife attended a settlement on this refinancing on the morning of January 26, 1988, where all papers were signed. It was debtor's intent to be at the scheduled foreclosure sale by 1:15 p.m. with funds from the new loan to pay the delinquent note.

Through a series of mishaps, debtor did not reach the foreclosure sale until after the sale had taken place, and the trustee had accepted the high bid of Bonnie Goldstein and James Grady. Their bid was in the amount of $131,000.00, which when considered with the bidders' required assumption of a first deed of trust, amounts to a purchase price of approximately $181,-000.00. This bid is still in effect pending this Court's resolution of the foreclosure controversy.

Although the debtor did eventually reach the location of the sale, the loan proceeds check, which was to be brought by the settlement attorney, was not delivered to the place of sale. Thus, even if debtor had been timely in reaching the sale, he would not have been in position to pay the note and stop the foreclosure. (There was testimony at the hearing indicating the lender was not aware of debtor's pending bankruptcy case until the day of settlement.)

On January 27, 1988, debtor filed with the bankruptcy court his motion to set aside the foreclosure sale.

Evidence of debtor's appraisal witness reveals that the residence may have a fair market value between $342,000.00 and $355,000.00; this value reflects optimum marketing of the property and not a distress or forced sale value. In contrast to value testimony, the debtor's B–1 schedule lists the residence's fair market value at

$250,000.00. There is no opinion evidence before the Court of the forced sale value of the property.

Finally, the debtor's lender, who testified at the hearing, stated that he stands ready to lend the debtor up to $75,000.00 to refinance the Williams' note. It appears that this amount would be more than sufficient to pay the note plus other costs due under the note.[2]

*Discussion and Conclusions of Law*

This case presents a serious question. Under what circumstances, if any, should the bankruptcy court set aside a secured creditor's foreclosure sale of a debtor's real property following the court's entry of an order modifying the automatic stay which order effectively authorized the foreclosure? The issue is serious because of the vast number of automatic stay modification orders in bankruptcy cases.

Debtor's motion asks this Court to invoke its equitable powers under Section 105(a) of the Bankruptcy Code[3] to set aside the sale under a deed of trust foreclosure of the debtor's residence, located in the District of Columbia. The holder of the note secured by the deed of trust had been granted relief by this Court from the automatic stay provisions of Section 362 of the Code. Under the relief from stay order the noteholder caused the debtor's residence to be sold at a foreclosure auction sale on January 26, 1988, at which sale the parties who oppose the debtor's motion were the successful high bidders for the property. The noteholder stands neutral here and asks only to be paid in full.

For reasons stated in this opinion, the Court declines to exercise its equitable powers in this proceeding. Accordingly, the debtor's motion is denied.

The bankruptcy court is a court of law as well as a court of equity, and the court may exercise broad, equitable powers provided the exercise of those powers is consistent with the Bankruptcy Code's provisions. *See, Johnson v. First Nat'l Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir. 1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *Fisher v. First Union Mortgage Corp. (In re Fisher)* 80 B.R. 58, 62 (Bankr.M.D.N.C.1987).

This Court has the authority to set aside the foreclosure sale of the debtor's residence. *In re Fisher,* 80 B.R. at 62; *accord, In re Ernst,* 45 B.R. 700, 12 B.C.D. 893 (Bankr.D.Minn.1985). The bankruptcy court possesses this authority since the debtor's residence technically remains property of the estate under Code Section 541, notwithstanding removal of the automatic stay, at least until debtor is divested of all interest in the property by the foreclosure. If the foreclosure sale results in a surplus after payment of lien claims against the property and costs of sale, the surplus would remain an asset of the estate. The bankruptcy court, of course, has and may exercise extensive jurisdiction over the administration and protection of the property of the estate. *See,* 28 U.S.C. § 157(b) (Supp.IV 1986); 28 U.S.C. § 1334 (1982 & Supp.IV 1986); and *In the Matter of the Administration of the Bankruptcy Courts and Reference of Bankruptcy Cases and Proceedings to the Bankruptcy Judges of this District* (E.D.Va. August 15, 1984) (Standing Order of Reference of Bankruptcy Cases, Matters, and Proceedings).

However, this Court should not exercise its equitable powers in a vacuum without giving due consideration to the state court issues involved in foreclosure proceedings and to the impact in general that would

---

2. The Court notes that the debtor failed to seek this Court's approval of the credit arrangement with the noninstitutional lender prior to the loan's settlement as required by Section 364 of the Bankruptcy Code.

3. 11 U.S.C. § 105(a) states:
    The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No

provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent any abuse of process.
11 U.S.C. § 105(a) (Supp. IV 1986).

result from the undoing of a relief from stay order. Both legal and commercial considerations require that there must be a point of finality to a foreclosure with the secured creditor capable of transferring good title to the collateral in satisfaction of the security interest.

Before considering debtor's principal arguments in support of his motion, the Court will address two preliminary circumstances which debtor believes support his position.

Debtor points to the ex parte manner in which Judge Bostetter's order of November 30, 1987, granted relief from the stay to the noteholder. The record shows that several months prior to the entry of the November 30 order, the Court had entered an order agreed to by the debtor and the noteholder; the earlier order settled all disputes between these parties and among other things provided that if debtor defaulted in payment of the stipulated monthly payments which were to commence May 15, 1987, the noteholder would be allowed to enforce his deed of trust. Debtor never made any payment required under this "drop dead" order. Arguably, upon debtor's new default of the settlement terms no further order of the bankruptcy court was required to authorize the noteholder to foreclose. However, following the usual practice in this district, the creditor's attorney on November 13, 1987, filed with the Court a motion for entry of a new order granting relief from the stay pursuant to the previous settlement order. The attorney certified mailing a copy of the motion to debtor's counsel. Although debtor's counsel has stated he did not receive a copy of the motion filed November 13, he did promptly receive a copy of Judge Bostetter's order entered on November 30. Debtor did not appeal or otherwise question the entry of the relief from stay order, and in the opinion of the Court there is no justification now for debtor's suggestion that the circumstances surrounding entry of the order somehow support the setting aside of the foreclosure sale.

Rather than question the Court's entry of the November 30 order granting relief from the stay, the debtor elected to attempt to make arrangements to pay off the deed of trust prior to the scheduled foreclosure on January 26, 1988. Much of debtor's evidence at the hearing concerned his efforts to obtain a new loan for this purpose. For the most part, the Court considers this evidence of little relevance to the issue which must be decided. However, debtor has submitted evidence that he can obtain financing sufficient to pay the Williams' note in full should the Court grant his motion.[4]

The principal factual basis for the debtor's assertion that the foreclosure sale of January 26, 1988, should be set aside is the alleged substantial disparity between two fair market value appraisals of the realty ($342,000.00, $355,000.00) and the foreclosure bid price ($181,000.00). Therefore, before considering the legal theories advanced by debtor, the Court must first determine just what disparity exists.

█ It is the Court's view that since the matter being contested by the debtor is the foreclosure sale which was authorized by this Court's relief from stay order, the appropriate property value for measuring the potential loss to the estate is forced sale or liquidation value rather than the optimum fair market value. The evidence of value here is less than satisfactory since the testimony of debtor's witness indicates he did not take the circumstances of bankruptcy and foreclosure into account. Since there is no direct evidence of forced sale value other than the $181,000.00 bid price, which may well be low, the Court will base its estimation of the disparity on a valuation of $250,000.00, the amount originally used by debtor in his petition schedule B–1. This valuation is approximately 27 percent less than the appraisal witness' fair market value of $342,000.00.

To arrive at the debtor's equity, the value of the property must be reduced by the

**4.** The proposed financing, which has not been approved by the Court and cannot be considered favorable, provides for payments of interest only at a rate of 24 percent for ten years, at which time the full loan is due.

amount of liens against the property. The record reveals there is a first deed of trust balance of approximately $50,000.00. The payoff balance of the second deed of trust was approximately $58,000.00 at the time of the foreclosure. This balance has no doubt increased since January 1988, and for the present purpose of approximating debtor's equity, the Court will use an estimated balance of $65,000.00, including additional interest and costs. Thus the total liens of the two deeds of trust against the property as supported by the record are in the amount of approximately $115,000.00.

The final factor to be considered in the question of debtor's equity in the property is his ownership interest. Debtor and his spouse, who is not a debtor in a bankruptcy case, own the property as tenants by the entirety. The presumption that debtor and his spouse own equal interests in the realty is supported by debtor's original joint disclosure statement which states that debtor's equity of $64,650.00 represents a one-half interest.[5]

Based upon this analysis, the Court finds that the debtor owns a one-half interest in the property and that the forced sale value of his equity is $67,500.00 ($250,000.00 value less $115,000.00 for deed of trust payoffs, times one-half). Since the debtor's bankruptcy estate should receive back any surplus from the foreclosure sale,[6] the loss to the estate under this analysis, if the foreclosure sale stands, is $67,500.00 equity reduced by the foreclosure surplus returned to the estate.[7]

In arguing that the bankruptcy court should invoke equitable powers granted by Section 105(a) and enjoin the completion of the foreclosure sale of January 26, 1988, debtor states in his counsel's memorandum that the sale should be set aside to protect the integrity of and avoid irreparable harm to the bankruptcy estates of the debtor and his related corporation MPSA; this action of the Court would balance the hardships between the parties.

In support of his position debtor cites, among other cases, *Medical Plaza, Ltd. v. Medical Plaza Associates, Ltd. (In re Medical Plaza Associates, Ltd.)*, 67 B.R. 879 (W.D.Mo.1986), which affirmed a bankruptcy court injunction continuing an automatic stay in effect after expiration of the thirty day period provided by Section 362(e). The court found it necessary to continue the stay in effect in order to avoid having the bankruptcy estate stripped of its only asset; the substantial harm to the estate and unsecured creditors outweighed the inconvenience to the creditor who sought to foreclose its deed of trust. However, the circumstances of *Medical Plaza Associates* are significantly different from those in the instant case. Here this Court ordered relief from the stay almost two months before the foreclosure sale complained of by the debtor; in addition, the effect of the loss of the debtor's residence to his estate is open to question.

Debtor further relies upon Code Section 548(a) which provides for the avoidance of fraudulent transfers made by a debtor within one year prior to the bankruptcy petition and Section 549 which provides for the avoidance of certain post petition transfers. In particular, debtor relies upon court decisions under Section 548(a) which have set aside prepetition foreclosure sales of debtor properties where sale prices were found to be inadequate in relation to prop-

---

5. Although the first amended joint disclosure statement states debtor's equity in the property is approximately $160,000.00, there is nothing in the record here to indicate debtor's interest should be more than one-half of the equity in the property. The Court is unable to determine how the debtor arrived at a value of $160,-000.00. It may derive from the $342,000.00 appraisal value less the $181,000.00 foreclosure bid.

6. *See, Hallet v. Commerce Bank of Barry County (In re Billick)*, 67 B.R. 670, 674 (Bankr.W.D.Mo. 1986).

7. Based upon the record before the Court, the debtor's estate should receive approximately $33,000.00 in equity surplus from the foreclosure sale ($181,000.00 bid less $115,000.00 for deed of trust payoffs, times one-half). Of course, this is an estimate which may be reduced by trustee's commission and other costs of foreclosure.

erty value.[8]

In this Court's opinion, the strict standards of Section 548(a) should not be considered in this case. The inadequate foreclosure price cases cited by debtor are inapplicable here because Section 548(a) specifically authorizes the setting aside of certain transfers of property for inadequate consideration but limits the application to transfers within one year *prior* to bankruptcy. *See, In re Fisher,* 80 B.R. at 60–61.

Under Section 549, debtor cites *Hallet v. Commerce Bank of Barry County (In re Billick),* 67 B.R. 670 (Bankr.W.D.Mo.1986), which has some factual similarity to the instant case although it does not involve the bankruptcy court's equity powers under Section 105(a). In *Billick* the bankruptcy court, which had entered an order conditionally granting relief from the automatic stay, was asked to approve the secured creditor's proposed sale of the security real estate for a price below fair market value. Before the condition imposed by the court in granting relief from stay was satisfied, the debtor had given the secured creditor a deed in lieu of foreclosure. The court found that Section 549 required the court's authorization for the secured creditor's proposed sale as well as for the debtor's attempted transfer to the creditor. The court refused to authorize the creditor's proposed sale since the total consideration was approximately $80,000.00 less than the value of the property and was not "reasonably equivalent value" (citing Section 548(a)(2)).

*Billick* is not persuasive of the result sought by the debtor here because of at least two important distinctions. Relief from stay was granted in *Billick* under a condition which, the court noted, was never satisfied, and, moreover, the court's relief order had been based largely upon the secured creditor's submission of evidence reflecting a property value much less than actual value. Thus the court in *Billick* was well justified in ignoring its prior order

granting relief from the stay. See discussion under *In re Fisher,* 80 B.R. 58, *infra.*

Debtor argues that his equity in the residence is "a significant, if not decisive" asset which will induce creditors to vote in favor of the joint reorganization plan of the debtor and his 100 percent owned corporation, MPSA, also a chapter 11 debtor. It is stated that the loss of this equity, which would reduce the liquidation value of the estate, would necessitate a reduction in the proposed 100 percent distribution to his creditors. The Court finds this argument hard to support since nowhere in either joint disclosure statement or the joint plan does debtor propose to sell or borrow against his residence for purposes of paying his unsecured creditors. Nor is there any indication that the debtor's spouse, a co-owner, has consented to any use of the property in a plan of reorganization other than as a residence. It is rather obvious in view of the argument described in the preceding paragraph that debtor intends to retain his residence for his family use and not as a source of funds to creditors. According to the "Implementation" paragraph of the amended disclosure, all plan payments are to be made from future earnings of the "Debtor". The joint plan makes it apparent that the success of the reorganization of both debtors depends upon earnings of the corporation MPSA. *See, Debtor's Memorandum of Points and Authorities In Support of Motion to Set Aside Foreclosure Sale,* at 10–11. Finally, in this connection, if debtor's chapter 11 case should ever be converted to a case under chapter 7, there may be nothing to prevent the debtor from amending schedule B–4 and claiming his tenancy by the entirety real property exempt under Code Section 522(b)(2)(B).

As another basis for the Court's setting aside the foreclosure, debtor argues that the foreclosure sale was not conducted in a commercially reasonable manner; yet debtor has failed to show that the sale was not

---

**8.** *Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201, 6 B.C.D. 954 (5th Cir.1980); *General Indus., Inc. v. Shea (In re General Indus., Inc.),* 79 B.R. 124, 16 B.C.D. 775 (Bankr.D.Mass.1987). The latter case also reflects that under Section 548(a), courts will consider whether foreclosure sales were conducted in a commercially reasonable manner.

in accordance with the foreclosure provisions of the deed of trust or that these provisions were out of keeping with foreclosure procedures customary in the District of Columbia. Under circumstances presented here, this Court will not impose an artificial standard of commercial reasonableness for real estate foreclosures to justify the use of its equity powers.

Additionally, debtor contends that the loss of his residence would be harmful to his and to MPSA's creditors since he must then devote his substantial efforts to obtaining new housing to the detriment of his business operation. Although the loss would no doubt be unfortunate, as it would in many bankruptcy cases, the Court cannot consider this a major consideration in the legal issue to be decided in this adversary proceeding.

■ This Court is concerned over the effect of ruling that a foreclosure following a relief from stay may be set aside because the foreclosure sale does not bring as much as the estimated value of the collateral. In view of the limited circumstances under which a bankruptcy court should invoke its equity powers under Section 105(a), it is the Court's view that there must be present some special circumstance over and above the mere loss of value to warrant invoking equity in such a case.

The recent opinion of Judge Rufus W. Reynolds in *Fisher v. First Union Mortgage Corp. (In re Fisher)*, 80 B.R. 58 (Bankr.M.D.N.C.1987), is persuasive and instructive as it presents a factual situation almost identical to the case at bar. The debtors there sought to invalidate a postpetition foreclosure sale after having defaulted on a "drop dead" order lifting the automatic stay; they attempted to have the court set aside the foreclosure sale as fraudulent because the property sold for "$48,553.00 instead of the claimed fair market value of $65,000.00." *In re Fisher*, 80 B.R. at 62. Judge Reynolds refused to set the sale aside.

In delineating the bankruptcy court's power under Code Section 105(a) to upset a foreclosure sale, Judge Reynolds wrote:

Absent unusual and compelling circumstances or a particularly egregious fact situation, a Bankruptcy Court should not exercise its broad jurisdictional mandate as provided by section 105, to upset a perfectly proper and valid state court foreclosure proceeding which took place after the bankruptcy petition was filed and after the Court released the property from the automatic stay pursuant to section 362.

*Id.* This language is in conformity with the jurisdictional limitations imposed upon the bankruptcy court by case law and federal statute.

■ In the instant case this Court granted relief from stay to the deed of trust creditor, and notwithstanding debtor's misgivings about the entry of the relief order, he elected to deal with the situation presented to him by the impending foreclosure. The failure of debtor's plan to refinance the property and pay the secured debt by January 26, 1988, almost two months after relief from stay was granted, resulted from his financial problems and the delay inherent in any real estate financing. Now, having missed his opportunity to pay the deed of trust note prior to foreclosure, debtor seeks a second chance at the property by invoking the Court's equitable powers to overturn the foreclosure.

It may be true as debtor argues that the only parties who would suffer significantly from the setting aside of the foreclosure are the high bidders at the sale who will lose the benefit of their alleged bargain. However, the Court must consider the broader implications of the debtor's request.

After the bankruptcy court has entered an order granting relief from the automatic stay, the subject property is generally considered to be removed from the estate even though it may technically and temporarily remain property of the estate under Section 541. The status of the property following the relief from stay is similar to that following an abandonment. Property abandoned pursuant to Section 554 generally cannot be recovered by the debtor's estate notwithstanding a later determination of

value which might have benefitted the estate. *See, In re Fisher*, 80 B.R. at 61.

Finally, as mentioned previously, there must be a point of finality in a foreclosure of a security interest. The desirability for a secured creditor to realize lien rights against collateral security notwithstanding the bankruptcy of the obligor and property owner is recognized by the Bankruptcy Code which in Section 362 has provided a mechanism for the creditor to proceed against the collateral. A vital part of any foreclosure is the lien holder's ability to pass good title to a purchaser and thereby maximize the recovery from the collateral, to the ultimate benefit of all lien creditors and even the debtor's estate if there is a nonexempt surplus. The establishment of a rule in bankruptcy that subjects foreclosure sales following relief from stay to a possibility of being overturned when the foreclosure price is less than fair market value would seriously undermine the foreclosure process. Therefore, any such rule must be reserved for the most extreme and compelling situations.

While the Court regrets the loss of the asset to the estate, the circumstances of this case do not justify use of the Court's equity powers under Section 105(a).